UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

TEAETTE OLDHAM,

        Plaintiff,

v.                                Civil Action No. 2:16cv659

NANCY A. BERRYHILL,
*Acting Commissioner of*
*Social Security*,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Teaette Oldham[1] ("Oldham") seeks judicial review of the Commissioner of Social Security ("Commissioner")'s denial of her claim for disability insurance benefits ("DIB") and supplemental Social Security income ("SSI"). Specifically, Oldham claims that the Administrative Law Judge ("ALJ")'s determination of residual functional capacity ("RFC") failed to properly account for her cognitive and physical impairments, and failed to give appropriate weight to the opinions of physicians and other evidence. She also argues that the opinion failed to analyze a relevant listing for her significant vision impairment. Oldham claims correcting for these alleged errors could result in her being found disabled and therefore seeks remand of her claim. This action was referred to the undersigned United States Magistrate Judge pursuant to provisions of 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure.

---

[1] Both Plaintiff's first and last name are spelled inconsistently throughout documents filed in this matter, as well as on the court's docket. For purposes of consistency, the court will use Plaintiff's name as it appears in the style of her original complaint filed November 10, 2016 (ECF No. 1), which is Teaette Oldham.

After reviewing the parties' briefs and the administrative record of the Agency's findings, this Report concludes that the ALJ's decision failed to comply with recent Fourth Circuit precedent regarding Oldham's limitations in concentration, persistence and pace, and improperly assessed Oldham's vision impairments and need for an assistive device.  Accordingly, for the reasons stated in detail below, this report recommends that the court REMAND the final decision of the Commissioner by DENYING the Commissioner's Motion for Summary Judgment (ECF No. 16) and GRANTING IN PART Oldham's Motion for Summary Judgment (ECF No. 12).

## I.    PROCEDURAL BACKGROUND

On November 14, 2012, Oldham filed an application for DIB and SSI.  R. at 19.  She alleged that she was disabled as of September 10, 2009, due to major depression, back problems, poor vision, hepatitis C, cirrhosis of the liver, right eye blindness, carpel tunnel syndrome, and anxiety.  R. at 80, 267.  The state agency denied her application initially and again upon reconsideration.  R. at 106-07, 137-38.  Oldham then requested an administrative hearing, which was conducted June 23, 2015.  R. at 71.  Oldham was represented by an attorney.  R. at 19.

The ALJ determined Oldham was last eligible for DIB under the Social Security Act on March 31, 2010, identifying this as Oldham's Date Last Insured ("DLI").  Id.  The ALJ denied Oldham's claims for DIB and SSI, finding she was not disabled between September 10, 2009, and July 7, 2015.  R. at 33.  The Appeals Council denied Plaintiff's request for review on November 16, 2016.  R. at 1-3.  Oldham then filed the Complaint in the present action seeking review of the administrative proceedings.  Compl. at 1 (ECF No. 1).

## II.    FACTUAL BACKGROUND

Oldham was born in 1965.  R. at 231.  On her DLI, she was 44 years old; at the time of the ALJ's decision, she was 49 years old.  She did not complete the ninth grade, and has rarely

worked. R. at 63. Her last job was at a thrift store hanging and folding clothes between January and February 2012. R. at 48. The relevant portions of Oldham's medical history are summarized here, as are the portions of the administrative proceedings below that are relevant to her arguments in this court.

a.    History of Mental Health Treatment and Evaluation.

Oldham received treatment for depression and anxiety at Norfolk Community Services Board ("CSB") from May 2012 to December 2014. See R. at 626-31, 756-85, 796-828. During her initial visit on May 1, 2012, her treating psychiatrist, Dr. Sari Kohazi, recorded that Oldham reported having experienced depression and anxiety for most of her life. R. at 626. She reported no history of hospitalization to treat mental illness or any other outpatient psychiatric care. Id. She complained of feelings of hopelessness and difficulty starting and completing tasks. Id. An examination of her mental status revealed she had a sad, depressed, and anxious mood and a constricted affect. Id. She was calm and had no psychomotor disturbances, atypical behaviors, paranoia, or hallucinations. R. at 628. She exhibited immediate retention and recall, grossly intact higher cognitive functions, and fair to good insight and impulse control. Id. Dr. Kohazi diagnosed her with a number of conditions: major depressive disorder, anxiety disorder, panic disorder with agoraphobia, as well as alcohol abuse, cannabis abuse, and opioid abuse, all "reportedly in remission." R. at 629. Dr. Kohazi assessed her in May 2012 with a Global Assessment of Functioning ("GAF") score of 65.[2] She exhibited "deficits in peer relations,

---

[2] Clinicians use the GAF scale, devised by the American Psychiatric Association and ranging from zero to one hundred, to indicate an overall judgment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). A GAF of 71-80 indicates that "if symptoms are present, they are transient and expectable reactions to psycho-social stressors;" a GAF of 61-70 indicates that the individual has "some mild symptoms;" a GAF of 51-60 indicates that the individual has "moderate symptoms;" and a GAF of 41-50 indicates that the individual has "serious symptoms." Id. However, the DSM-V abandoned the use of GAF scores as a diagnostic tool for assessing a patient's functioning because of the questionable probative value of such scores. Diagnostic and Statistical Manual of Mental Disorders (DSM-V), 16

deficits in dealing with authority, poor impulse control, clinical depression and anxiety, and other dysfunctional symptoms having an adverse impact on concentration, the ability to learn, and the ability to participate in employment and social activities." R. at 630. Dr. Kohazi directed her to abstain from alcohol and drugs and to continue taking a prescribed anti-depressant and a drug used to treat panic disorders. Id.

Over the course of her treatment at CSB, Oldham sometimes reported doing well or feeling good when she complied with her medication regimen. See, e.g., R. at 781 (Dec. 6, 2012), 784-85 (Sept. 7, 2012), 771-72 (Apr. 2, 2013), 775-76 (May 16, 2013). Her GAF scores varied between a low of 50 and a high of 65, but were generally between 55 and 65. E.g., R. at 759 (GAF of 65 on Apr. 2, 2013), 770 (GAF of 65 on Sept. 17, 2013), 799 (GAF of 55 on Dec. 19, 2013), 803 (50 on Mar. 4, 2014), 808 (59 on July 17, 2014), 814 (60 on Oct. 20, 2014), 822 (62 on Dec. 18, 2014). On one occasion, during a period of homelessness, she reported abusing alcohol once a month and feeling depressed. R. at 802 (treatment on Mar. 4, 2014).

In June 2014, her treating physician assessed a decline in her functioning and attributed it to her not maintaining her medication regimen. R. at 808. In October 2014, her physician reported she had not been taking her medications and that she had low mood but still exhibited intact higher cognitive functioning and impulse control as well as fair insight and judgment. R. at 813. In December 2014, Oldham still was not fully adhering to her prescribed medications, though she told her psychiatrist she was doing "okay." R. at 821-22. She admitted to her treating physicians that she occasionally smoked marijuana and drank in excess of five drinks two to four times per month. R. at 761.

---

(5th ed. 2013) (specifically, "conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice").

On a November 2014 Medical Evaluation form for the state's Department of Social Services, one of Oldham's psychiatrists, Dr. Bandaranayake, indicated she could not participate in employment and training activities "in any capacity" for 12 months. R. at 786. He hand-wrote a list of the limitations that would keep her from employment and training activities: "Depressed mood, anhedonia,[3] anxiety, low energy." R. at 787. But, he did not recommend she apply for disability. Id. In March 2015, Dr. Bandaranayake checked boxes on a functional capacity assessment form to indicate his opinion that Oldham had moderate limitations in carrying out detailed instructions, maintaining attention, performing activities on a schedule, working in coordination with others, or making simple work-related decisions., and a number of other areas of sustained concentration and persistence. R. at 789-90. Dr. Bandaranayake supplemented his check-the-box opinions, writing that his "interactions with Ms. Oldham [were] limited as I have only seen her twice, in October and December 2014." R. at 791. In June of 2015, Dr. Bandaranayake submitted a letter to Oldham's attorney confirming that his March 2015 assessment of her functional capacity was still accurate. R. at 830.

b.    History of Physical Health Treatment and Evaluation.

On May 26, 2011, Oldham was diagnosed with aphakia,[4] vitreous opacities, and hypermetropia.[5] R. at 404. She reported a history of lazy eye glaucoma, cataracts, legal blindness, and retinal detachment. R. at 403.

On May 3, 2013, Oldham sought treatment after she reportedly fell out of a vehicle, injuring her back and suffering rib pain. R. at 733. On May 16, 2013, she sought pain medication for a bruise that she incurred in the fall. R. at 669. On August 14, 2013, she sought

---

[3]Anhedonia is "Absence of pleasure from acts which would ordinarily be pleasurable." Stedman's Medical Dictionary, 88 (27th ed. 2000).
[4] Aphakia is the absence of the lens in the eye. Id. at 110.
[5] Hypermetropia is farsightedness arising from decreased refractivity of the eye's lens. Id. at 851, 852.

emergency room treatment for a head injury after a separate incident in which she was assaulted with a board; she was diagnosed with swelling and bruising over her right orbit. R at 697.

On August 23, 2013, Oldham underwent an ophthalmic examination at the request of the state agency. R at 741. Dr. Vincent Verdi recorded "Her uncorrected visual acuity is no light perception right eye, count fingers left eye. Best corrected visual acuity no light perception right eye, count fingers left eye." Id. He diagnosed her with "[s]ignificant congenital cataract surgery right and left eye that left with aphakic [sic] without lenses, with a retinal detachment and repair with multiple retinal scarring." R. at 742. He opined that she was limited in the following ways: "no depth perception, no driving and due to her visually significant legal blindness, she has difficulty ambulating." Id. He did note that Oldham was able to "maneuver" around the office. Id.

On September 16, 2013, Oldham underwent an examination at the request of the state agency with Dr. Richard Hoffman. R at 746. Dr. Hoffman recorded that Oldham could only see shadows out of her right eye, making daily hygiene difficult. Id. He reported she used a cane to help her maintain her balance. R. at 746, 748. She reported chronic back pain from previous work as a packer. R. at 747. Regarding her ability to walk, Dr. Hoffman opined:

> She used her cane to help her balance. She had significant difficulty climbing to and from the examination table. Gait was otherwise normal except for needing the cane for balance. She was able to do heel walk, toe walk and tandem walk, though she did seem to have difficulty maintaining a straight line apparently because of her vision at least that is what she said.

R. at 748. Dr. Hoffman concluded she had limitations on her ability to stand, walk, sit, lift, and carry, and that her visual limitations would keep her from safely driving a vehicle. Id. He also opined, "It is clear that she needs an assistive device for walking for balance because of her blindness." Id.

c.      Testimony Before the Administrative Law Judge.

Oldham testified before the ALJ at her hearing on June 23, 2015.  R. at 41.  Regarding her visual impairments, Oldham testified she was completely blind in her right eye.  R. at 51. She told the ALJ she needed a cane and that she stumbled and fell frequently because she had no cane to help her walk.  Id.  She also testified that she could not read a newspaper due to her visual limitations, R. at 62, and that she bumps into walls and people.  R. at 64.

Regarding her mental health, she suffered from depression and anxiety and had to receive treatment at a crisis center in March 2014 because of her mental health struggles.  R. at 51-52. She admitted to having an alcohol dependency but testified she had been abstinent from alcohol in the 12 months before the hearing.  R. at 47.  She also described two falls where she broke bones in her hands.  R. at 50.

The ALJ also elicited testimony from Barbara Beyers, a vocational expert ("VE"), to assist him in determining whether there were jobs in the national economy Oldham was capable of performing.  See R. at 65.  He presented the VE with the following hypothetical person: someone of Oldham's age, education, and work background who

> could perform light work provided that work would not require more than occasional postural activities, would not require any climbing or exposure to heights or hazards, could be performed by a person having monocular vision only and would be limited to the performance of only simple, repetitive and routine tasks.

R. at 65-66.  The VE testified that there were jobs in the national economy in significant numbers a person so situated could perform.  R. at 66.  She identified cashier, produce sorter and folding machine operator as positions that fit within the hypothetical.  R. at 66.  When asked what difference it would make if the hypothetical person were to also have the limitations Dr. Bandaranayake found Oldham to have—limitations regarding concentration, maintaining a schedule, keeping up a routine, etc.—the VE testified there would be no jobs available for such a

7

person in significant numbers in the national economy. R. at 67-68. Likewise, if Oldham's self-described limitations related to standing or walking were credited, they would preclude all work. R. at 66-67.

### III.   STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017). Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.    ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits, and be under a "disability" as defined in the Act. 42 U.S.C. §§ 416(i), 423. The Social Security Regulations define "disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A). To meet this definition, a claimant must have a "severe impairment" that makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

(1)    Is the individual involved in substantial gainful activity?

(2)    Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

(3)    Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

(4)    Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

9

(5)    Does the individual's impairment or impairments prevent him or her from doing any

other work?

20 C.F.R. § 1520(a)(4).

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability.   An affirmative answer to question three or five establishes disability.  See id. §§ 404.1520, 416.920.  The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Lewis, 858 F.3d at 861 (citing Monroe v. Colvin, 826 F.3d 176, 179-80 (4th Cir. 2016)).  When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age.   Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)).   At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

In this case, after conducting the foregoing analysis, the ALJ concluded that Oldham met the insured status requirements from her alleged disability onset date, September 10, 2009, through her date last insured, March 31, 2010, but had not been under a disability within the meaning of the Social Security Act between the alleged disability onset date and the date of the hearing. See R. at 19, 33.

Regarding her DIB claim, at step one, the ALJ found Oldham had not engaged in substantial gainful activity from her alleged disability onset date to her date last insured.  R. at 21.  At step two, the ALJ found that Oldham suffered from no severe impairments during that

period. Id.  Consequently, the ALJ found she was not disabled from her alleged onset date to her

DLI.  R. at 22.

Regarding her SSI claim, at step one, the ALJ found Oldham had not engaged in

substantial gainful activity since November 14, 2012, the date she applied for SSI, until the day

of the hearing.  R. at 22.  At step two, the ALJ found that Oldham suffered from the following

severe impairments: "back disorder, right eye blindness; mood disorder; anxiety disorder; and

alcohol abuse."  R. at 23 (citing 20 C.F.R. 416.920(c)).  At step three, the ALJ found that

Oldham did not suffer from a listed impairment or combination of impairments that met the

severity of one of the listed impairments.  Id.  At step four, the ALJ found that Oldham had no

past relevant work at the substantial, gainful activity level.  R. at 31.  The ALJ then developed a

finding regarding Oldham's RFC, determining that Oldham had

> the residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b) except the claimant can perform work that requires no more than
> occasional postural activity; no climbing, or exposure to heights or hazards;
> monocular vision only; and only simple, routine, repetitive tasks, due to
> limitations in concentration, persistence, or pace.

R. at 25.  At step five, relying on the testimony of the VE, the ALJ concluded that jobs existed in

significant numbers in the national economy which Oldham could perform.  R. at 24-25.

Consequently, the ALJ determined Oldham did not have a qualifying disability during the

relevant period and denied her claim for SSI.  R. at 26.

Oldham now argues the ALJ erred in a number of respects.  First, she asserts the ALJ

failed to accommodate her impairments in concentration, persistence, and pace by limiting her to

only "simple, routine, repetitive tasks."  Pl.'s Mem. at 15 (ECF No. 13).  Second, she asserts the

ALJ erred in rejecting the medical opinions of the physicians who treated and evaluated her and

as a result crafted an RFC that does not fully account for her limitations.  Id. at 17.  Third, she

asserts the ALJ failed to adequately explain why her vision impairments did not meet or equal a

Listing. Id. at 20. Fourth, she argues the ALJ erred in not considering the use of a cane in developing his RFC, thereby providing an incomplete hypothetical to the VE. Id. at 22. Finally, she claims the ALJ failed to give sufficient reasons for not considering evidence generated after her DLI. Id. at 23. After reviewing the record and the briefing from both parties, the undersigned concludes that three of the errors identified by Oldham's pleadings require remand of her claim for benefits.

a.  The ALJ could not accommodate Oldham's mental limitations only by limiting her to work consisting of simple, routine, repetitive tasks.

Oldham first contends that the ALJ's RFC failed to account for her limitations in social functioning, concentration, persistence, and pace of activity in the work setting. Pl.'s Mem. at 7-12 (ECF No. 13). Relying primarily on the Fourth Circuit's decision in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015),[6] Oldham argues the RFC did not sufficiently accommodate her difficulty functioning in a work setting. Specifically, she claims the non-exertional limitations restricting her to simple, routine, repetitive tasks are inadequate to account for her limited ability to maintain concentration, stay on task during the workday, and interact with supervisors.

An RFC is the plaintiff's maximum ability to work despite her impairments. 20 C.F.R. § 404.1545(a)(1); see also Social Security Ruling 96-9p, 1996 WL 374185 (July 2, 1996) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis."). When, as is the case here, a plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must determine the plaintiff's RFC. 20 C.F.R. 404.1520(e). At step four, the ALJ then determines whether the plaintiff can perform her past relevant work. Id. § 404.1545(a)(5)(i). If the ALJ determines that the plaintiff cannot perform any relevant past work, as was the case for Oldham, the ALJ uses

---

[6] Mascio was decided March 15, 2015, only three months before the ALJ's opinion denying Oldham's claim for benefits.

the RFC at step five to determine if the plaintiff can "adjust to any other work that exists in the national economy." Id. § 404.1545(a)(5)(ii).

The ALJ determines a claimant's RFC at the administrative hearing level, and considers all of the relevant medical and other evidence[7] in the record. Id. §§ 404.1527(b), 404.1545(a)(3), 404.1546(c). "[R]elevant evidence . . . includ[es] information about the individual's symptoms and any 'medical source statements' – i.e., opinions about what the individual can still do despite his or her impairment(s) – submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

Here, the ALJ determined that Oldham has the RFC to perform light work involving the performance of "simple, routine, repetitive tasks, due to limitations in concentration, persistence or pace." R. at 25. The ALJ's RFC did not impose any other limitations to account for Oldham's moderate limitations in concentration, persistence, or pace. Likewise, the hypothetical presented to the VE by the ALJ limited Oldham to only simple, unskilled or routine tasks. Given the moderate limitations in concentration, persistence or pace found by the ALJ at step 2, this was insufficient under Mascio.

In Mascio, the Fourth Circuit held that the ALJ had not accounted for the claimant's moderate limitations in concentration, persistence and pace or social interaction merely by limiting the claimant to unskilled work. 780 F.3d at 635. Unless the residual functional capacity assessment includes a narrative discussion describing why the moderate limitation did not produce functional limits on the ability to work, those limits need to be addressed by the RFC. Id. at 636 (quoting Social Security Ruling 96-8p). When the ALJ does fashion an appropriately

---

[7] "Other evidence" includes "statements or reports from [the claimant], [the claimant's] treating or nontreating source, and others about [the claimant's] medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how ... how impairment(s) and any related symptoms affect [the claimant's] ability to work. 20 C.F.R. § 404.1529(a).

limited RFC or performs an explicit function-by-function analysis to explain—explicitly or implicitly[8]—why additional limitations are not needed, the <u>Mascio</u> standard is satisfied. <u>Id.</u> (quoting <u>Cichocki v. Astrue</u>, 729 F.3d 172, 177 (2d Cir. 2013)); <u>Watson v. Colvin</u>, No. 2:15cv407, 2016 WL 4154920, at *1, *3 (E.D. Va. Aug. 3, 2016) (reviewing cases decided after <u>Mascio</u>).

The Commissioner argues that the ALJ's analysis complies with <u>Mascio</u> because it includes the "function-by-function" analysis sufficient to support his conclusion that Oldham's moderate limitations in concentration, persistence and pace did not require additional non-exertional limits. It is true that the ALJ conducted a detailed examination of the medical record, but that examination nowhere addresses the issue framed by <u>Mascio</u>, which is that the ability to stay on task is different from the ability to complete simple or routine tasks. 780 F.3d at 637-38.

After reviewing the medical evidence in detail, the ALJ gave little weight to the opinions of both treating mental health providers, Dr. Kohazi and Dr. Bandaranayake, stating they were inconsistent with their medical record and progress notes, as well as Oldham's reported treatment and testimony. R. at 31. There are issues with the ALJ's assessment of these providers' opinions as set forth elsewhere. But, even accepting the ALJ's assessment at face value, this analysis does not address the <u>ALJ's finding</u> that Oldham was moderately limited in concentration, persistence and pace. See <u>Boyet v. Comm'r of Soc. Sec. Admin.</u>, No. 1:14cv762, 2016 WL 614708, at *6 (M.D.N.C. Feb. 16, 2016) (ALJ's decision to credit state agency consultants does not "provide a logical bridge between the ALJ's conclusion that plaintiff

---

[8] <u>Mollett v. Colvin</u>, No. 2:13cv28018, 2015 WL 1481842, at *3 (S.D.W. Va. Mar. 31, 2015) ("[ALJ did not err when he conducted] a lengthy and thoughtful analysis supporting his function findings, with reference to both the evidence adduced at the administrative hearing and the opinions of various medical and psychological experts, explaining whom he credits and why. While it might be argued that he did not parse and compartmentalize the functional limitation discussion, a reviewer can readily ascertain the ALJ's thinking as it is evident in his discussion of the claimant's testimony and the other evidence of record. Under these circumstances, nothing more is required.").

suffered moderate concentration deficits and the ALJ's decision that plaintiff could perform simple tasks in the workplace without any further concentration-related restriction"); Wedwick v. Colvin, No. 2:14cv267, 2015 WL 4744389, at *21-24 (E.D. Va. July 7, 2015).

Mascio established that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter would account for a claimant's limitation in concentration, persistence or pace." 780 F.3d at 638. After Mascio, such limits are most commonly addressed by restricting the claimant to "non-production work," or imposing other restrictions on contact with the public or supervisors. See, e.g., Eastwood v. Colvin, No. 3:15cv156, 2016 WL 805709, at *4 (E.D. Va. Feb. 12, 2016) (holding ALJ accommodated claimant's concentration and pace limitations by limiting her to (1) few workplace changes; (2) little independent decision-making and (3) less than an assembly line pace); Hunter v. Berryhill, No. 3:17cv112, 2018 WL 310138, at *13 (E.D. Va. January 5, 2018) (finding ALJ complied with Mascio by limiting claimant to "simple, routine tasks, not at a production rate, where she has no more than occasional changes in continue work setting, occasional contact with superiors . . . and no contact with the public"). The ALJ in this case failed to include any such limits in Oldham's RFC, and failed to provide a logical bridge from which the court can conclude no such limitations were necessary despite her moderate limitations in concentration, persistence and pace. Accordingly, the decision does not comply with Mascio and remand is the appropriate remedy.[9]

---

[9] Neither party has addressed the issue of whether Oldham's substance abuse may have been a contributing factor to her concentration-related impairments. See Sizemore v. Berryhill, 878 F.3d 72, 79-81 (4th Cir.). In fact, the ALJ's finding suggests her limitations may be related to substance abuse. R. at 24. But Oldham testified that she had stopped drinking and only occasionally used marijuana at the time of her hearing. And the ALJ did not attempt to distinguish whether her existing limits in concentration, persistence and pace would be affected if her testimony regarding abstinence were fully credited. Cf. Sizemore, 8 F.3d at 81 (citing 20 CFR § 404.15 35(b)(1). ("The key factor is whether we would still find you disabled if you stopped using drugs and alcohol."). Accordingly, the undersigned is unable to conclude on the existing record that Oldham's moderate limitations in concentration, persistence and pace are due solely to substance abuse.

b.   On remand the Administrative Law Judge must assess the opinions of Oldham's treating and examining physicians in light of Lewis v. Berryhill, 858 F.3d 858 (4th Cir. 2017).

Oldham also objects to the limited weight assigned by the ALJ to opinions from her healthcare providers.   An ALJ can only discredit the opinions of treating physicians if there is medical evidence in the record conflicting with those opinions and if he explains why he favored the conflicting evidence over the treating providers' opinions.   Lewis, 838 F.3d at 869.   It is not sufficient for the ALJ to "cherry pick facts that support a finding of non-disability while ignoring evidence that supports a disability finding."   Id. (citing Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010).   In this case, several treating or examining providers offered opinions regarding Oldham's functional limitations which were either discounted or given no weight by the ALJ.

For example, a consulting ophthalmologist, Dr. Verdi wrote: "Oldham's visual fields are 100% constricted due to the visual acuity, no light perception, count fingers."   He assigned significant limitations noting, "there is no depth perception, no driving due to her visually significant legal blindness, she has difficulty ambulating."   R. at 741-42.

A second consulting examiner, Dr. Hoffman wrote: "It is clear she needs an assistive device for walking for balance and because of her blindness."   R. at 748.

Her treating psychiatrist, Dr. Kohazi, noted that Oldham has deficits in peer relations, dealing with authority, and impulse control.   She has clinical depression, anxiety, and other dysfunctional symptoms that have an adverse impact on her ability to concentrate, learn, and participate in employment and social activities.   R. at 630.

A second treating psychiatrist, Dr. Bandaranayake, in March 2015 stated: Oldham cannot work for 12 months because of depressed mood, anhedonia, anxiety, and low energy.   He assigned a number of moderate limitations.   R. at 789-91.

16

Both Dr. Verdi and Dr. Hoffman concluded that Oldham would require an assistive device, such as a cane.  The ALJ discounted each of these opinions by pointing to alleged insufficiency of the medical records of the providers.  For example, with regard to both Dr. Verdi and Dr. Hoffman, the ALJ discounted their opinions because "they relied heavily on the claimant's subjective statements and allegations."  R. at 31.  But Dr. Verdi's examination of Oldham documented her extensive history of vision problems, including complete right eye blindness and the ability to only see fingers with her left eye.  He observed her to have retinal scarring, retinal detachment and aphakic (without lenses) in both eyes.  R. at 742.  Likewise, Dr. Hoffman observed that Oldham "used her cane to help her balance," "had significant difficulty climbing to and from the examination table," and "need[ed] cane for balance."  R. at 748  He concluded, "It is clear she needs an assistive device for walking for balance because of her blindness."  Id.  The ALJ did not explain how these recorded observations, all of which tend to support Oldham's need for an assistive device, were overwhelmed by the doctors' alleged overreliance on her subjective complaints.

Similarly, with regard to her mental health providers, the ALJ rejected the opinions of Oldham's treating providers in favor of state agency consultants who examined only her records. R. at 31.  The ALJ also assigned greater weight to Oldham's GAF scores above 61 and less weight to those below 61 because in the ALJ's view the "record as a whole reflects more mild than moderate symptoms."  R. at 31.  But GAF scores are "a snapshot of a person's functioning at a particular moment in time."  Sutton v. Colvin, 2016 WL 7426591, at *15 (E.D. Va. Nov. 29, 2016). And many of the lower GAF scores were more recent in time.  R. at 31, 799 (GAF of 55, September 2013), 803 (GAF of 50, March 4, 2014).  Additionally, the Commissioner also argues that the ALJ discounted the treating physicians' opinions because they were inconsistent with

their own medical records, citing examples throughout the treatment record in which Oldham
appeared only mildly impaired. Def.'s Mem. at 21 (ECF No. 47) (citing R. at 628, 758, 762, 769
and others). But some of these same records assessed Oldham's functional limitations, including
"deficits in peer relations, dealing with authority, poor impulse control," R. at 630; or described
moderate symptoms of the kind supporting Oldham's claimed limitations – "anhedonia,
spontaneous tearfulness, diminished ability to concentrate . . . feelings of helplessness." R. at
769. The ALJ did not separately analyze the apparent inconsistency in these records, noting only
that the consulting physicians' assessments were "consistent with the claimant's progress notes."
R. at 30. Finally, with respect to concentration, persistence and pace, the ALJ specifically found
"moderate limitations" due to her "history of substance abuse." Id. But Oldham testified, and
her medical records did not contradict, that she had been abstinent from alcohol for twelve
months. The opinion did not attempt to determine whether Oldham's concentration limitations
were such that they should be excluded from consideration as the result of active substance
abuse. 20 C.F.R. § 404.1535(b)(1).

c.    The ALJ did not sufficiently explain his reasons for finding Oldham's vision impairments
      did not meet or equal a listing.

"The Social Security Administration has promulgated regulations containing 'listings of
physical and mental impairments which, if met, are conclusive on the issue of disability."
Radford v. Colvin, 734 F.3d 288, 291 (4th Cir. 2013) (quoting McNunis v. Califano, 605 F.2d
743, 744 (4th Cir. 1979)). A claimant is entitled to this conclusive presumption of impairment "if
he can show that his condition 'meets or equals the listed impairments.'" Id. (quoting Bowen v.
City of New York, 476 U.S. 467, 471 (1986)). To meet the requirements of a listing, a claimant
"must have a medically determinable impairment(s) that satisfies all of the criteria in the listing."
20 C.F.R. § 404.1525(d). An ALJ is obliged to explain his findings in sufficient detail to allow a

18

court to determine if they were supported by substantial evidence.  <u>Radford v. Colvin</u>, 734 F.3d at 291.  Oldham asserts the ALJ erred by not explaining in detail why he found that her vision impairments did not meet or equal a Listing under 20 C.F.R. § 404.200 for visual impairment. Pl.'s Mem. at 21 (ECF No. 13).

A claimant for disability benefits under one of the Listings must show she meets <u>all</u> criteria for that Listing, and the burden is on her to demonstrate the same.  <u>See</u> <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990) (citing SSR 83-19, 1983 WL 31248 (Jan. 1, 1983)[10]); <u>Smith v. Schweiker</u>, 795 F.2d 343, 346 (4th Cir. 1986).  A claimant's impairments meet or equal the Listing for visual impairment when central visual acuity in the better eye is 20/200 or less with the use of a correcting lens or when the better eye has a visual field of 20 degrees or less.  20 C.F.R. § 404.200.

In this case, the ALJ's opinion recites that he considered several listings, including those for special senses and speech which include the listing for visual impairment.  R. at 24.  Except for her mental impairments, the ALJ's opinion did not analyze any of the other listings, or compare their requirements with the limitations caused by Oldham's impairments.  Recognizing that the ALJ's conclusion was "stated summarily," the Commissioner argues that any failure to explain his decision constitutes harmless error.  Def.'s Mem. at 24 (ECF No. 17).

A claim should only be remanded from a District Court in the event such error was actually harmful to the claimant.  <u>Bishop v. Comm'r of Soc. Sec.</u>, 583 F. App'x 65, 67 (4th Cir. 2014).  When the challenged "decision 'is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.'"  <u>Id.</u>

---

[10] SSR 83-19 has been rescinded in part to the extent it addressed the procedures used to determine disability in children.  It otherwise remains an accurate representation of the Social Security Administration's policies and regulations.  <u>See</u> SSR 91-7c, 1991 WL 231791 (Aug. 1, 1991).

(quoting Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010)).  However, when the medical record "is not so one sided that one could clearly decide, without analysis, that [a listing] is not implicated," remand is appropriate.  Brown v. Colvin, 639 F. Appx. 921, 923, 2016 WL 502918, at *2 (4th Cir. 2016).

In this case, the ALJ did not describe, or analyze the evidence supporting his finding that Oldham's impairments did not meet the listing for vision impairments.   In its brief, the Commissioner argues that the ALJ's assessment of her claimed vision impairments elsewhere in his opinion establishes that his failure to assess the listing for vision impairments was harmless. See, e.g., R. at 23, 25-28 (citing R. at 807 (with glasses, Oldham can "see without problem")). But in this case, the record of Oldham's vision impairments is not so one-sided as to clearly establish – without analysis – that she did not meet the requirements of Listing 2.02.

As already noted, Oldham had extensive and well documented vision problems.  These included no light perception in her right eye, and could only "count fingers" with her left eye.  R. at 741-42.  She had corneal scarring and peripheral retinal scarring due to a retinal detachment and macular scarring.  Id.  She had previously been diagnosed with aphakia, vitreous opacities, and farsightedness.  R. at 403-04, 669, 742.  Her visual acuity is 100% constricted, she had "no depth perception." These diagnoses were obtained by ophthalmologists who had personally examined or treated Oldham during the period of alleged disability.  Their opinions  support Oldham's own statements that she had frequent balance issues related to her vision, could not read a newspaper or complete paperwork, required a cane for balance and frequently fell and bumped into things.  R. 50-51, 62-64.

Against this evidence the Commissioner now observes that the agency record reviewers disagreed with the examining physicians and that Oldham had sometimes made conflicting

statements about her vision impairments.  Def.'s Mem. at 26 (ECF No. 17).  While it is true the record reflects some conflict in the evidence, the ALJ did not resolve the conflicts – as argued by the Commissioner.  Instead, his "summarily stated" conclusion did not examine the elements of the listing or compare Oldham's obviously significant vision limitations to those required by the listing.  As a result, remand is warranted.  Bradford, 734 F.3d at 295 (remanding where the "medical record includes a fair amount of evidence supportive of [the] claim" that plaintiff meets the elements of a Listing).

d.    The ALJ's RFC determination that Oldham did not need an assistive device is not supported by substantial evidence.

The ALJ's RFC findings should include limitations that find support in the record. *Johnson*, 434 F.3d at 659.  Use of a hand-held assistive walking device, like a cane, may affect an individual's RFC by limiting her ability to lift, carry, push and pull. *Fletcher v. Colvin*, 2015 WL 4506699, at *8 (M.D.N.C. July 23, 2015) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(J)(4)).  However, the ALJ need only consider "medically required" assistive walking devices when making the RFC assessment. Id. (quoting SSR 96-9p).

To establish a medical requirement, the claimant must present medical documentation (1) supporting her need for an assistive walking device, and (2) describing the circumstances that require it. Id. The ALJ then "must always consider the particular facts of a case." Wimbush v. Astrue, 2011 WL 1743153, at *2 (W.D. Va. May 6, 2011) (quoting SSR 96-9p).  Given the fact-specific nature of the ALJ's inquiry, neither a prescription for a cane, nor the lack thereof, necessarily determines whether the claimant medically requires an assistive device. Fletcher, 2015 WL 4506699, at *8 (citing Staples v. Astrue, 329 F. App'x 189, 191-92 (10th Cir. 2009)); Wimbush, 2011 WL 1743153, at *2-3 (citing SSR 96-9p) (additional citations omitted).  The claimant must provide documentation from an approved medical source to establish the basis for

her impairment and subsequent need for an assistive walking device. 20 C.F.R §§ 404.1513, 416.913; see also Jones v. Comm'r of Soc. Sec., 2011 WL 3273129, at *9 (E.D. Va. June 9, 2011) (finding that, under the regulations, a nurse practitioner did not qualify as an approved medical source for the purpose of establishing the existence of a medical impairment). If the claimant fails to supply appropriate documentation, the ALJ need not include the use of an assistive walking device in the RFC assessment. Fletcher, 2015 WL 4506699, at *8.

When considering whether to include a need for a cane in Oldham's RFC, the ALJ reviewed a range of evidence. He considered Oldham's testimony that she used a cane. R. at 57. He also considered the fact that Dr. Hoffman, one of the State Agency's examining physicians, opined that she needed a cane to balance, attributing it to her blindness in her right eye. R. at 28 The ALJ discounted Dr. Hoffman's opinion because he based the conclusion not on clinical testing but on Oldham's subjective statements about her vision problems. R. at 30-31. He also purported to discount Dr. Hoffman's opinion about Oldham's need for a cane because the doctor's other observations of Oldham contradicted the conclusion that she needed a cane. R. at 31 (citing R. at 748). But the record cited by the ALJ actually contradicts this conclusion. The record cited reflects Dr. Hoffman's observation of Oldham, noting she had "a normal gait other than using a cane for balance, able to heel walk, toe walk, and tandem walk with difficulty maintaining a straight line because of her vision at least that is what she said." Dr. Hoffman was unequivocal in stating "It is clear she needs an assistive device for walking for balance and because of her blindness." R. at 748 (emphasis added). In rejecting Oldham's testimony and her physicians' opinions that she needed a cane, the ALJ relied on other facts in the record suggesting that Oldham had no medical need for the cane within the meaning of the Social Security Regulations. The first was treating physicians' observations that Oldham was

22

ambulatory.  R. at 25-29 (citing R. at 427, 748).  For example, Dr. Verdi – who noted that Oldham had "no depth perception" and "had difficulty ambulating" – also observed that she could "maneuver" around his office. R. at 742. The ALJ also seems to have discounted her need for a cane based on her own testimony which disclosed that she had lost her cane, and that she also stated she sometimes walked up to eight blocks to go to the store. See R. at 57.  But on examination by her attorney, Oldham testified that she lost her cane and did not have any money to replace it.  R. at 57.  Moreover, it is not clear from the record that the walking she earlier described to the ALJ was without a cane, as Oldham did not testify when she lost it and both Oldham and her doctors confirmed she previously used one, R. at 57, 748, and that it was "clear" that she needed one.  R. at 748.

Because substantial evidence does not support the ALJ's finding that Oldham did not require the use of an assistive device, and his hypothetical to the VE did not include her need for a cane, the ALJ's finding of no disability is not based on substantial evidence, and remand is appropriate.  Walker v. Bowen, 887 F.2d 47, 50 (4th Cir. 1989).

## V.   **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the court DENY the Commissioner's Motion for Summary Judgment (ECF No. 16), GRANT IN PART Oldham's Motion for Summary Judgment (ECF No. 12), and REMAND the case for reconsideration by the Commissioner.

## VI.   **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file written objections to the foregoing findings and recommendations within fourteen days from the date of service of this

Report on the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

      2.     A district judge shall make a <u>de novo</u> determination of those portions of this report or specified findings or recommendations to which objection is made.

      The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

                                     /s/
                                Douglas E. Millar
                                United States Magistrate Judge

                                **DOUGLAS E. MILLER**
                                **UNITED STATES MAGISTRATE JUDGE**

Norfolk, Virginia

January 17, 2018